UNITED STATES DISTRICT COURTS

CENTRAL DISTRICT OF CALIFORNIA

NORTHERN DISTRICT OF CALIFORNIA

WESTERN DISTRICT OF WASHINGTON

**CR01-020R**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | No. CR 01-_____ | (C.D.CA) |
| Plaintiff, | No. | (N.D.CA) |
| v. | No. | (W.D.WA) |
| MATSON NAVIGATION COMPANY, INC., | PLEA AGREEMENT FOR DEFENDANT MATSON NAVIGATION COMPANY, INC. | |
| Defendant. | | |

1.   This constitutes the plea agreement between MATSON
NAVIGATION COMPANY, INC. ("defendant") and the United States
Attorney's Offices for the Central District of California, Northern
District of California, Western District of Washington, and the
Environmental Crimes Section of the United States Department of
Justice (collectively the "United States" or "government") in the
above-captioned case.  The terms of the agreement are as follows:

### GUILTY PLEAS

2.   Defendant agrees to waive indictment by grand jury and to
plead guilty in the Central District of California to a four-count
Information charging defendant with felony violations of Title 18,
United States Code, Section 1001(a)(3), for knowingly and willfully
making and using a materially false writing or document, namely, a
false Oil Record Book for the vessel Lihue, in a matter within the
jurisdiction of the executive branch of the government of the United



1  States, namely, the United States Coast Guard.

2       3.   Defendant agrees to waive indictment by grand jury and to
3  plead guilty in the Northern District of California to a one-count
4  Information charging defendant with a felony violation of 18 U.S.C.
5  § 1001(a)(3), for knowingly and willfully making and using a
6  materially false writing or document, namely, a false Oil Record
7  Book for the vessel Lihue, in a matter within the jurisdiction of
8  the executive branch of the government of the United States, namely,
9  the United States Coast Guard.

10      4.   Defendant agrees to waive indictment by grand jury and to
11  plead guilty in the Western District of Washington to a one-count
12  Information charging defendant with a felony violation of 18 U.S.C.
13  § 1001(a)(3), for knowingly and willfully making and using a
14  materially false writing or document, namely, a false Oil Record
15  Book for the vessel Lihue, in a matter within the jurisdiction of
16  the executive branch of the government of the United States, namely,
17  the United States Coast Guard.

18      5.   In each of the above-listed districts, defendant will enter
19  its guilty pleas through its counsel of record, by resolution of
20  defendant's Board of Directors.

21      6.   The parties agree to waive the preparation of a presentence
   report and will request that defendant be sentenced as recommended
23  below on the date of the entry of the guilty pleas.
24
                          NATURE OF THE OFFENSE
25
        7.   In order for defendant to be guilty of violating 18 U.S.C.
26
   § 1001(a)(3), the following must be true: (1) defendant knowingly
27
   and willfully made or used; (2) a false writing or document; (3) in
28
   a matter within the jurisdiction of the executive branch of the

                                  2

1  government of the United States, namely, the United States Coast
2  Guard; and (4) knowing the false writing or document contained a
3  materially false, fictitious, or fraudulent statement or entry.  By
4  signing this agreement, defendant admits that defendant is, in fact,
5  guilty of these offenses as described in the Informations.

### PENALTIES

7     8.  The statutory maximum sentence that the Court can impose on
8  an organization for each violation of 18 U.S.C. § 1001(a)(3) is as
9  follows: a term of five years probation, pursuant to 18 U.S.C. §
10  3561(c)(1); a fine consisting of the greater of $500,000, pursuant
11  to 18 U.S.C. § 3571(c)(3), or twice the gross pecuniary gain derived
12  from the crimes or twice the gross pecuniary loss caused to the
13  victims of the crime, pursuant to 18 U.S.C. § 3571(d); and a special
14  assessment of $400, pursuant to 18 U.S.C. § 3013(a)(2)(B).

### FACTUAL BASIS

16    9.  Defendant and the government agree and stipulate to the
17  following statement of facts:

18         a)  During the period between 1996 and 1998, defendant
19  was involved primarily in the business of carrying goods and cargo
20  on ocean-going ships.

21         b)  During this time period, defendant operated and
23  controlled a fleet of ships that included the Lihue.  The Lihue
24  weighed approximately 38,000 gross tons and was capable of carrying
25  hundreds of shipping containers.  The Lihue operated on the high
26  seas and in ports along the west coast of the United States,
27  including Los Angeles and Oakland, California, and Seattle,
28  Washington.

         c)  Defendant's ships, like the Lihue, produced

3

1 quantities of waste oil during the operation of machinery in their
2 engine rooms.  Some of this waste oil, along with water and other
3 liquids, accumulated in the bottom or "bilges" of the ship.
4 Typically, this waste liquid drained into "bilge wells," which were
5 small compartments set into the bottom of the engine room
6 compartment.  The waste was then collected and run through various
7 processes designed to separate the oil and other wastes from the
8 water.  These processes included settling tanks and a water
9 pollution prevention device known as an "Oil Water Separator" (also
10 referred to as a "Bilge Water Separator").  The Oil Water Separator
11 was designed to remove or separate the oils from the water prior to
12 the discharge of the "clean" water overboard into the sea.  An Oil
13 Water Separator required maintenance and cleaning on a regular
14 basis.  The oil removed from the waste, along with other waste oils
15 from the ship, was to be stored in a sludge tank.  Oil-contaminated
16 waste and other waste oils, including sludge, were supposed to be
17 unloaded while the vessel was in port and properly disposed of on
18 shore or burned.

19       d)    Under federal law, ships of more than 400 gross tons
20 are required to maintain a record known as an "Oil Record Book."
21 In this Oil Record Book, transfers of oil, the disposal of sludge
23 and bilge water, and overboard discharges of bilge water that have
24 accumulated in engine room machinery spaces are to be fully
25 recorded.

26       e)    The Coast Guard is charged with enforcing the laws of
27 the United States and is empowered to board ships and conduct
28 investigations of potential violations.  In conducting inspections
and pollution investigations, Coast Guard personnel rely upon the

4

1 | statements of the ship's crew and documents, including the Oil

2 | Record Book.   Entries in the Oil Record Book are material to the

3 | Coast Guard.

4 |         f)   On or about each of the dates listed below, in the

5 | Port of Los Angeles, Central District of California, crew members on

6 | the vessel Lihue made or used entries in the Oil Record Book of that

7 | vessel which falsely claimed that bilge waters had been discharged

8 | overboard after being properly processed through the Oil Water

9 | Separator; when in truth and fact, the Oil Water Separator was not

10 | operating and functioning on the vessel at the time of the false

11 | entries.   Specifically, defendant's crew members used the false

12 | entries in the Oil Record Book during inspections conducted by the

13 | Coast Guard on the following dates: November 19, 1996; December 24,

14 | 1996; November 6, 1997; and April 17, 1998.   The discharges at issue

15 | occurred beyond the contiguous zone of the United States.

16 |         g)   On or about March 14, 1997, in the Port of Oakland,

17 | Northern District of California, crew members on the vessel Lihue

18 | made or used entries in the Oil Record Book of that vessel which

19 | falsely claimed that bilge waters had been discharged overboard

20 | after being properly processed through the Oil Water Separator; when

21 | in truth and fact, the Oil Water Separator was not operating and

       functioning on the vessel at the time of the false entries.

23 |
       Specifically, on that date, defendant's crew members used the false

24 |
       entries in the Oil Record Book during an inspection conducted by the

25 |
       Coast Guard.   The discharges at issue occurred beyond the contiguous

26 |
       zone of the United States.

27 |

       h)   On or about August 14, 1996, in the Port of Seattle,

28 |
       Western District of Washington, crew members on the vessel Lihue

1 | made or used entries in the Oil Record Book of that vessel which
2 | falsely claimed that bilge waters had been discharged overboard
3 | after being properly processed through the Oil Water Separator; when
4 | in truth and fact, the Oil Water Separator was not operating and
5 | functioning on the vessel at the time of the false entries.
6 | Specifically, on that date, defendant's crew members used the false
7 | entries in the Oil Record Book during an inspection conducted by the
8 | Coast Guard.  The discharges at issue occurred beyond the contiguous
9 | zone of the United States.

10 |                        SENTENCING FACTORS

11 |      10.  Defendant understands that the Court is required to
12 | consider and apply the United States Sentencing Guidelines
13 | ("U.S.S.G." or "Sentencing Guidelines"), but may depart from those
14 | guidelines under some circumstances.

15 |      11.  Defendant and the government agree and stipulate that,
16 | pursuant to U.S.S.G. §§ 8C2.1 and 8C2.10, the sentencing guidelines
17 | are not applicable in determining the fine for an organization
18 | violating statutes relating to the environment.

19 |      12.  Defendant and the government therefore jointly agree that
20 | an aggregate criminal fine (including community service) of
21 | $3,000,000 (three million dollars) is appropriate.  The parties
     | agree that the monies shall be imposed as follows:
23 |
     |      a)  In the Central District of California, defendant shall
24 |
     | pay on the date of sentencing a criminal fine and community service
25 |
     | in the amount of $2,000,000 (two million dollars), based on the
26 |
     | statutory penalties set forth above in paragraph 8 and the community
27 |
     | service amounts set forth in paragraph 18.  Payment shall be in the
28 |
     | form of a check or wire payable to the United States and as directed

                                   6

1   in paragraph 18 on the date of sentencing.

2         b)   In the Western District of Washington, defendant shall
3   pay on the date of sentencing a criminal fine and community service
4   in the amount of $500,000, based on the statutory penalties set
5   forth above in paragraph 8 and the community service amounts set
6   forth in paragraph 19.   Payment shall be in the form of a check or
7   wire payable to the United States and as directed in paragraph 19 on
8   the date of sentencing.

9         c)   In the Northern District of California, defendant
10  shall pay on the date of sentencing a criminal fine and community
11  service in the amount of $500,000, based on the statutory penalties
12  set forth above in paragraph 8 and the community service amounts set
13  forth in paragraph 20.   Payment shall be in the form of a check or
14  wire payable to the United States and as directed in paragraph 19 on
15  the date of sentencing.

16        d)   Pursuant to U.S.S.G. §§ 8D1.1 and 8D1.2, defendant
17  shall be sentenced to a term of probation of three (3) years, based
18  upon the following factors set forth in 18 U.S.C. § 3553(a):   The
19  nature and circumstances of the offense and the history and
20  characteristics of the defendant; and the need for the sentence
21  imposed to reflect the seriousness of the offense, to promote
    respect for the law, to provide just punishment for the offense, and
23
    to afford adequate deterrence to criminal conduct.   This term of
24
    probation will include a condition that defendant maintain an
25
    environmental compliance program as described in paragraph 22 below.
26
        13.   Defendant agrees to pay to the Clerk of the Court for the
27
    United States District Court for the Central District of California
28
    on the date of sentencing (or as soon as the Court is able to accept

                                7

1 the payment) the mandatory assessment of $1,600 ($400.00 per count
2 of the Information), pursuant to 18 U.S.C. § 3013(A)(2)(B).

3     14.  Defendant agrees to pay to the Clerk of the Court for the
4 United States District Court for the Northern District of California
5 on the date of sentencing (or as soon as the Court is able to accept
6 the payment) the mandatory assessment of $400 ($400.00 per count of
7 the Information), pursuant to 18 U.S.C. § 3013(A)(2)(B).

8     15.  Defendant agrees to pay to the Clerk of the Court for the
9 United States District Court for the Western District of Washington
10 on the date of sentencing (or as soon as the Court is able to accept
11 the payment) the mandatory assessment of $400 ($400.00 per count of
12 the Information), pursuant to 18 U.S.C. § 3013(A)(2)(B).

13     16.  There is no agreement as to defendant's criminal history
14 or criminal history category.

15     17.  The stipulations in this agreement do not bind either the
16 United States Probation Office or the Court.  The Court will
17 determine the facts and calculations relevant to sentencing.  Both
18 defendant and the government are free to: (a) supplement the facts
19 stipulated to in this agreement by supplying relevant information to
20 the United States Probation Office and the Court, and (b) correct
21 any and all factual misstatements relating to the calculation of the
sentence.

23

### COMMUNITY SERVICE

24

25     18.  The parties agree to recommend that $1,000,000 of the
criminal fine amount of $2,000,000 imposed in the Central District
26
of California be suspended for the explicit purpose of defendant
27
applying the suspended amount to performing Community Service
28
pursuant to U.S.S.G. § 8B1.3 and in furtherance of the sentencing

8

1  principles provided for under 18 U.S.C. § 3553(a).  The explicit
2  goal of defendant's required community service is to fund
3  environmental projects and initiatives designed for the benefit,
4  protection, preservation, and restoration of the environment and
5  ecosystems in the Central District of California, which includes the
6  counties of Los Angeles, Orange, Ventura, Santa Barbara, San Luis
7  Obispo, Riverside, and San Bernardino, as well as the Channel
8  Islands.  These projects and initiatives should primarily be
9  designed to support and enhance the enforcement of environmental and
10  wildlife protection laws.  These projects may also include, but are
11  not limited to, the following:  monitoring, study, restoration, and
12  preservation of fish, wildlife, and plant resources; monitoring,
13  study, clean up, remediation, sampling, and analysis of pollution
14  and other threats to the environment and ecosystem; research,
15  education, and public outreach relating to the environment and
16  ecosystem.  Accordingly, defendant agrees to pay a total of
17  $1,000,000 to the National Park Foundation (the "NPF"), 16 U.S.C. §
18  19e, et seq., for use in the below-listed National Parks.  The NPF
19  is a charitable and nonprofit corporation established pursuant to 16
20  U.S.C. §§ 19e-19o.  It was established to encourage "private gifts
21  of real and personal property" for the benefit of the National Park
23  Service in order "to further the conservation of natural, scenic,
24  historic, scientific, educational, inspirational, or recreational
25  resources for future generations of Americans."  Id. § 19e.  The NPF
26  is empowered to "do any and all lawful acts necessary or appropriate
27  to its purposes," including acceptance and administration of any
28  "gifts, devises, or bequests."  Id. §§ 19g and 19j.  The monies
shall be used to support the following:

9

1          a)   $500,000 to the Channel Islands National Park (the

2  "Channel Islands NP") headquartered in Ventura, California.

3  $350,000 of the monies shall be used to establish the "Channel

4  Islands Law Enforcement Fund" as an endowment in perpetuity to

5  support and implement the enforcement of environmental and marine

6  wildlife protection laws within the Channel Islands NP, including,

7  but not limited to, the following: staffing; purchase of

8  communication and defensive equipment and patrol vessels and

9  vehicles; training; purchase and/or construction of facilities and

10  equipment used in the collection, identification, preservation,

11  analysis, and storage of evidence, including archaeological

12  artifacts and protected or threatened wildlife and plants; and

13  accounted for to Congress in annual reports required by 16 U.S.C.

14  § 19n.   The remaining $150,000 shall be used directly by the Channel

15  Islands NP to fund the "Island Fox Recovery Project," including

16  staffing and purchasing of services, equipment, supplies, and

17  materials that aid in the recovery of the island fox.

18          b)   $500,000 to the Santa Monica National Recreation Area

19  (the "Santa Monica NRA") headquartered in Thousand Oaks, California.

20  $250,000 of the monies shall be used to establish the "Santa Monica

21  Mountains Law Enforcement Fund" as an endowment in perpetuity to

23  support and implement the enforcement of environmental and wildlife

24  protection laws within the Santa Monica NRA, including, but not

25  limited to, the following: staffing; purchase of communication and

26  defensive equipment and patrol vessels and vehicles; training;

27  purchase and/or construction of facilities and equipment used in the

28  collection, identification, preservation, analysis, and storage of

    evidence, including archaeological artifacts and protected or

1  threatened wildlife and plants; and accounted for to Congress in
2  annual reports required by 16 U.S.C. § 19n.  The remaining $250,000
3  shall be used to establish the "Santa Monica Mountains Natural
4  Resource Protection Fund" as an endowment in perpetuity to support
5  the study, assessment, protection, and preservation of natural
6  resources, including, but not limited to, the following: acquisition
7  of private property, claims, and leases within and adjacent to the
8  Santa Monica NRA; response to and clean up of pollution spills or
9  threats of pollution; research and planning for the restoration of
10  natural ecosystems and resources; provide public environmental and
11  historical interpretation and education; and accounted for to
12  Congress in annual reports required by 16 U.S.C. § 19n.

13      19.  The parties agree to recommend that $250,000 of the
14  criminal fine amount of $500,000 imposed in the Western District of
15  Washington be suspended for the explicit purpose of defendant
16  applying the suspended amount to performing Community Service
17  pursuant to U.S.S.G. § 8B1.3 and in furtherance of the sentencing
18  principles provided for under 18 U.S.C. § 3553(a).  The explicit
19  goal of defendant's required community service is to fund
20  environmental projects and initiatives designed for the benefit,
21  protection, preservation, and restoration of the environment and
23  ecosystems in the Western District of Washington.  These projects
24  and initiatives should primarily be designed to support and enhance
25  the enforcement of environmental and wildlife protection laws.
26  These projects may also include, but are not limited to, the
27  following:  monitoring, study, restoration, and preservation of
28  fish, wildlife, and plant resources; monitoring, study, clean up,
    remediation, sampling, and analysis of pollution and other threats

11

1  to the environment and ecosystem; research, education, and public
2  outreach relating to the environment and ecosystem. Accordingly,
3  defendant agrees to pay a total of $250,000 to the NPF, 16 U.S.C.
4  § 19e, et seq., for use in Olympic National Park (the "Olympic NP")
5  headquartered in Seattle, Washington. $125,000 of the monies shall
6  be used to establish the "Olympic NP Law Enforcement Fund" as an
7  endowment in perpetuity to support and implement the enforcement of
8  environmental and wildlife protection laws within the Olympic NP,
9  including, but not limited to, the following: staffing; purchase of
10  communication and defensive equipment and patrol vessels and
11  vehicles; training; purchase and/or construction of facilities and
12  equipment used in the collection, identification, preservation,
13  analysis, and storage of evidence, including archaeological
14  artifacts and protected or threatened wildlife and plants; and
15  accounted for to Congress in annual reports required by 16 U.S.C.
16  § 19n.   The remaining $125,000 shall be used to establish the
17  "Olympic NP Natural Resource Protection Fund" as an endowment in
18  perpetuity to support the study, assessment, protection, and
19  preservation of natural resources, including, but not limited to,
20  the following: acquisition of private property, claims, and leases
21  within and adjacent to the Olympic NP; response to and clean up of
23  pollution spills or threats of pollution; research and planning for
   the restoration of natural ecosystems and resources; provide public
24
   environmental and historical interpretation and education; and
25
   accounted for to Congress in annual reports required by 16 U.S.C.
26
27  § 19n.

28      20.   The parties agree to recommend that $250,000 of the
   criminal fine amount of $500,000 imposed in the Northern District of

12

1  California be suspended for the explicit purpose of defendant
2  applying the suspended amount to performing Community Service
3  pursuant to U.S.S.G. § 8B1.3 and in furtherance of the sentencing
4  principles provided for under 18 U.S.C. § 3553(a).  The explicit
5  goal of defendant's required community service is to fund
6  environmental projects and initiatives designed for the benefit,
7  protection, preservation, and restoration of the environment and
8  ecosystems in the Northern District of California.  These projects
9  and initiatives should primarily be designed to support and enhance
10  the enforcement of environmental and wildlife protection laws.
11  These projects may also include, but are not limited to, the
12  following:  monitoring, study, restoration, and preservation of
13  fish, wildlife, and plant resources; monitoring, study, clean up,
14  remediation, sampling, and analysis of pollution and other threats
15  to the environment and ecosystem; research, education, and public
16  outreach relating to the environment and ecosystem.  Accordingly,
17  defendant agrees to pay a total of $250,000 to the NPF, for use in
18  the below-listed National Parks.  The monies shall be used to
19  support the following:

20       a)  $125,000 to the Golden Gate National Recreation Area
21  (the "Golden Gate NRA") headquartered in San Francisco, California.
23  The monies shall be used to support and implement the enforcement of
    environmental and marine wildlife protection laws within the Golden
24  Gate NRA, including, but not limited to, the following: staffing;
25  purchase of communication and defensive equipment and patrol vessels
26  and vehicles; training; purchase and/or construction of facilities
27  and equipment used in the collection, identification, preservation,
28  analysis, and storage of evidence, including archaeological

1  artifacts and protected or threatened wildlife and plants.  The
2  monies shall also be used support the study, assessment, protection,
3  and preservation of natural resources, including, but not limited
4  to, the following: acquisition of private property, claims, and
5  leases within and adjacent to the Golden Gate NP; response to and
6  clean up of pollution spills or threats of pollution; research and
7  planning for the restoration of natural ecosystems and resources;
8  provide public environmental and historical interpretation and
9  education.  All of these monies shall be accounted for to Congress
10 in annual reports required by 16 U.S.C. § 19n.

11         b)  $125,000 to the Point Reyes National Seashore (the
12 "Point Reyes NP") headquartered in Point Reyes, California.  The
13 monies shall be used to support and implement the enforcement of
14 environmental and wildlife protection laws within the Point Reyes
15 NP, including, but not limited to, the following: staffing; purchase
16 of communication and defensive equipment and patrol vessels and
17 vehicles; training; purchase and/or construction of facilities and
18 equipment used in the collection, identification, preservation,
19 analysis, and storage of evidence, including archaeological
20 artifacts and protected or threatened wildlife and plants.  The
21 monies shall also be used to support the study, assessment,
23 protection, and preservation of natural resources, including, but
24 not limited to, the following: acquisition of private property,
25 claims, and leases within and adjacent to the Point Reyes NP;
26 response to and clean up of pollution spills or threats of
27 pollution; research and planning for the restoration of natural
28 ecosystems and resources; provide public environmental and
   historical interpretation and education.  All of these monies shall

14

1  be accounted for to Congress in annual reports required by 16 U.S.C.
2  § 19n.

3      21.   Defendant agrees that because the payments to the
4  foundation listed above are community service by an organization,
5  defendant will not seek any reduction in its tax obligations as a
6  result of such community service payment.  Defendant further agrees
7  that because these payments are part of a criminal settlement agreed
8  upon in this plea agreement, defendant will not characterize,
9  publicize, or refer to the payment as anything other than a
10  community service payment made as a condition of probation
11  incidental to a criminal conviction.

12                        ENVIRONMENTAL COMPLIANCE

13      22.   As a condition of its probation in each District,
14  defendant must do the following to improve environmental compliance:

15          a)   Defendant currently has in place an environmental
16  compliance program, including implementation of the United States
17  Coast-approved International Safety Management ("ISM") Code (the
18  "compliance program").  Defendant agrees to maintain the compliance
19  program, which, at a minimum, contains the provisions summarized in
20  Attachment A.   Attachment A is incorporated into this Agreement
21  herein by reference.

23          b)   Defendant agrees that it will maintain its policy of
24  meeting or surpassing the requirements of applicable federal, state,
25  and local environmental laws and regulations.  (Attachment A,
26  paragraph A.)

27          c)   Defendant confirms that it has adopted and implemented
28  the ISM Code throughout its active fleet of vessels.  Defendant
    agrees to maintain the ISM certification for all of the active

                                  15

1  vessels operated by defendant.  (Attachment A, paragraph D.)

2          d)   ISM certification is set forth in the Matson Safety
3  Management System, mandated by the ISM Code (the "ISM System").
4  Defendant agrees to maintain and enforce all procedural and training
5  requirements set forth in the ISM System.  (Attachment A, paragraph
6  D.)

7          e)   Defendant confirms that it has initiated the process
8  of obtaining certification under the American Bureau of Shipping
9  ("ABS") Safety, Quality, and Environmental Management Program
10 ("SQE"), which combines the ISM Code, the ISO 9002 Quality
11 Management System, and the ISO 14001 Environmental Management
12 Standard into one program.  Defendant agrees to obtain SQE
13 certification.  (Attachment A, paragraph G.)

14         f)   Defendant agrees to make employee compliance with
15 environmental policies and the laws of the United States a positive
16 factor and the failure to comply a negative factor in all
17 evaluations it undertakes for the performances of all of its
18 employees on all of the vessels that it operates.  (Attachment A,
19 paragraph C.)

20         g)   Defendant agrees that, at the time of their annual
21 reviews, all non-bargaining unit employees, and Masters, First
   Mates, and Chief Engineers, will be required to sign an
23
   acknowledgment that they have received a copy of the Matson Code of
24
   Conduct (affirming defendant's policy of conducting business in
25
   accordance with the highest moral, legal, and ethical principles,
26
   and in compliance with all applicable laws and regulations) and have
27
   read and understood it.  (Attachment A, paragraph E.)   In addition,
28
   all Masters, First Mates, and Chief Engineers will specifically

16

1  certify the following: 1) that they understand their obligation
2  under the law to accurately record all mandated information in the
3  Oil Record Books and other official ship records; and 2) that they
4  understand that a knowingly false entry in such records or the
5  omission of known information that is required to be reported can
6  subject them and defendant to an enforcement response, including
7  administrative sanctions, civil penalties, and criminal prosecution.

8        h)   Defendant agrees that defendant's Personnel Relations
9  Department, Safety, Quality, and Environmental Affairs Department,
10 Vessel Operations and Offshore Labor Relations Department, and Law
11 Department will make quarterly reports to defendant's Corporate
12 Compliance Committee (the "Committee") in order to notify the
13 Committee of any violations of Matson's Code of Conduct relating to
14 the operation of defendant's vessels.   The Committee, in turn, will
15 report at least twice a year to defendant's Audit Committee of
16 defendant's Board of Directors, which in turn, will report at least
17 twice a year to defendant's full Board of Directors.   (Attachment A,
18 paragraph E.)

19       i)   Defendant agrees that pursuant to the compliance
20 program, it will file semi-annual (every six months) reports with
21 the United States Attorney's Office for the Central District of
23 California, the United States Attorney's Office for the Northern
24 District of California, the United States Attorney's Office for the
25 Western District of Washington, the United States Coast Guard 11th
26 District Marine Safety Office in Long Beach, California, the United
27 States Coast Guard 13th District Marine Safety Office in Seattle,
28 Washington, and the United States Environmental Protection Agency
   located in both San Francisco, California and Seattle, Washington,

17

1 regarding the compliance program and the results of all
2 environmental audits conducted pursuant to the compliance program.
3 Defendant's Director of Safety, Quality, and Environmental Affairs
4 shall review, sign and submit the reports.

5       j)   Defendant agrees to assume all costs associated with
6 the maintenance of and enhancements of its environmental compliance
7 program.

8                    THE GOVERNMENT'S OBLIGATIONS

9       23.  If defendant complies fully with all defendant's
10 obligations under this agreement, the government agrees:

11       a)   To abide by all sentencing stipulations contained in
12 this agreement.

13       b)   In exchange for defendant's guilty pleas, the
14 undersigned prosecuting offices agree that they will not file
15 additional charges against defendant based upon (1) the current
16 investigation, including any violations of the federal Clean Water
17 Act, 33 U.S.C. § 1251, et seq. and federal Oil Pollution Act, 33
18 U.S.C. § 1321 et seq., or (2) any violations relating to any false
19 statements regarding the operation of its ships, committed by
20 employees or agents of defendant during the period between January
21 1, 1995 and the date this agreement becomes effective.

                        BREACH OF AGREEMENT

23
        24.  If defendant, at any time between the execution of this
24
   agreement and defendant's sentencing knowingly violates or fails to
25
   perform any of defendant's obligations under this agreement ("a
26
   breach"), the government may declare this agreement breached.  If
27
   the government declares this agreement breached, and the Court finds
28
   such a breach to have occurred, defendant will not be able to

                              18

1  withdraw defendant's guilty pleas, and the government will be
2  relieved of all of its obligations under this agreement.

3       25.  Following a knowing and willful breach of this agreement
4  by defendant, should the government elect to pursue any charge that
5  was not filed as a result of this agreement, then:

6            a)    Defendant agrees that the applicable statute of
7  limitations is tolled between the date of defendant's signing of
8  this agreement and the government discovery of any knowing and
9  willful breach by defendant.

10            b)    Defendant gives up all defenses based on the statute
11  of limitations, any claim of preindictment delay, or any speedy
12  trial claim with respect to any such prosecution, except to the
13  extent that such defenses existed as of the date of defendant's
14  signing of this agreement.

15                   WAIVER OF APPEAL AND COLLATERAL ATTACK

16       26.  Defendant gives up the right to appeal any sentence
17  imposed by the Court, including any order of restitution, and the
18  manner in which the sentence is determined, provided that the
19  sentence is within the statutory maximum specified above and is
20  constitutional.  Defendant also gives up any right to bring a post-
21  conviction attack on the convictions or sentence, including any
23  order of restitution, except a post-conviction attack based on a
     claim of ineffective assistance of counsel, a claim of newly
24
     discovered evidence, or an explicitly retroactive change in the
25
     applicable Sentencing Guidelines, sentencing statutes, or statutes
26
     of conviction.
27
       27.  This agreement does not affect in any way the right of the
28
     government to appeal the sentence imposed by the Court.

19

1

## SCOPE OF AGREEMENT

2     28.  The Court is not a party to this agreement and need not

3 accept any of the government's sentencing recommendations or the

4 parties' stipulations.  Even if the Court ignores any sentencing

5 recommendation, finds facts or reaches conclusions different from

6 any stipulation, and/or imposes any sentence up to the maximum

7 established by statute, defendant cannot, for that reason, withdraw

8 defendant's guilty pleas, and defendant will remain bound to fulfill

9 all defendant's obligations under this agreement.  No one -- not the

10 prosecutor, defendant's attorney, or the Court -- can make a binding

11 prediction or promise regarding the sentence defendant will receive,

12 except that it will be within the statutory maximum.

13     29.  This agreement applies only to crimes committed by

14 defendant, has no effect on any proceedings against any defendant

15 not expressly mentioned herein, and shall not preclude any past,

16 present, or future forfeiture actions.  The parties are not aware of

17 any present or proposed forfeiture actions relating to the matters

18 at issue in this Agreement.

19     30.  This Agreement does not prevent the government from

20 prosecuting any individual or other organization for any offense,

21 including the offenses charged in the Information.

23     31.  This Agreement binds the United States Attorney's Offices

in the District of Guam and District of Hawaii.

24

## NO ADDITIONAL AGREEMENTS

25

26     32.  Except as set forth herein, there are no promises,

understandings or agreements between the government and defendant or

27 defendant's counsel.  Nor may any additional agreement,

28 understanding or condition be entered into unless in a writing

1  signed by all parties or on the record in court.

2       This agreement is effective upon signature by defendant and the

3  undersigned prosecuting offices.

4  AGREED AND ACCEPTED

5

   UNITED STATES ATTORNEY'S OFFICE
6  FOR THE CENTRAL DISTRICT OF CALIFORNIA

7  ALEJANDRO N. MAYORKAS
   United States Attorney

8

9                                            1/8/01

10 WILLIAM W. CARTER                Date
   Assistant United States Attorney
11 Deputy Chief, Public Corruption
   & Government Fraud Section
12

13                                          1/9/01

14 ERICA K. MARTIN                  Date
   Special Assistant
15 United States Attorney

16
   UNITED STATES ATTORNEY'S OFFICE
17 FOR THE NORTHERN DISTRICT OF CALIFORNIA

18 ROBERT S. MUELLER III
   United States Attorney

19

20                                          1/9/01

21 MELINDA L. HAAG                  Date
   Assistant United States Attorney

23 //

24 //

25

26

27

28

                          21

```
 1 │ UNITED STATES ATTORNEY'S OFFICE
   │ FOR THE WESTERN DISTRICT OF WASHINGTON
 2 │
   │ KATRINA C. PFLAUMER
 3 │ United States Attorney
   │
 4 │
   │
 5 │ _____        1/9/01
   │ HELEN J. BRUNNER                Date
 6 │ Assistant United States Attorney
   │
 7 │
   │ UNITED STATES ATTORNEY'S OFFICE
 8 │ FOR THE DISTRICT OF HAWAII
   │
 9 │ STEVEN S. ALM
   │ United States Attorney
10 │
   │
11 │ _____        1/8/01
   │ LES OSBORNE                     Date
12 │ Assistant United States Attorney
   │
13 │
   │
14 │ UNITED STATES ATTORNEY'S OFFICE
   │ FOR THE DISTRICT OF GUAM
15 │
   │ FREDERICK A. BLACK
16 │ United States Attorney
   │
17 │
   │
18 │ _____        1/8/01
   │ KARON JOHNSON                   Date
19 │ Assistant United States Attorney
   │
20 │
   │ UNITED STATES DEPARTMENT OF JUSTICE
21 │
   │ LOIS J. SCHIFFER
   │ Assistant Attorney General
23 │ Environmental and Natural Resources Division
   │
24 │
25 │ _____
   │ GREGORY F. LINSIN
26 │ Special Litigation Counsel
   │ Environmental Crimes Section
27 │
28 │      As an authorized representative of defendant Matson Navigation
```

Company, Inc. ("Matson"), I have read this agreement and carefully

discussed every part of it with Matson's attorney. I understand the

terms of this agreement, and I voluntarily agree to those terms.

Matson's attorney has advised me of Matson's rights, of possible

defenses, of the Sentencing Guideline provisions, and of the

consequences of entering into this agreement. No promises or

inducements have been made to me or Matson other than those

contained in this agreement. No one has threatened or forced me or

Matson in any way to enter into this agreement. Finally, I am

satisfied with the representation of Matson's attorney in this

matter.

_____          1/3/01
Authorized Representative                Date
of Matson Navigation Company,
Inc.
Defendant


    I am Matson's attorney. I have carefully discussed every part

of this agreement with the authorized representatives of Matson.

Further, I have fully advised the authorized representatives of

Matson's rights, of possible defenses, of the Sentencing Guidelines'

provisions, and of the consequences of entering into this agreement.

To my knowledge, the decision of Matson and its authorized

representatives to enter into this agreement is an informed and

voluntary one.

_____          Jan. 3, 2001
ROBERT BONNER                            Date
THOMAS HOLLIDAY
Counsel for Defendant
Matson Navigation Company, Inc.

23

1  Company, Inc. ("Matson"), I have read this agreement and carefully
2  discussed every part of it with Matson's attorney.  I understand the
3  terms of this agreement, and I voluntarily agree to those terms.
4  Matson's attorney has advised me of Matson's rights, of possible
5  defenses, of the Sentencing Guideline provisions, and of the
6  consequences of entering into this agreement.  No promises or
7  inducements have been made to me or Matson other than those
8  contained in this agreement.  No one has threatened or forced me or
9  Matson in any way to enter into this agreement.  Finally, I am
10 satisfied with the representation of Matson's attorney in this
11 matter.

12

13 _____        _____
   Authorized Representative          Date
14 of Matson Navigation Company,
   Inc.
15 Defendant

16

17    I am Matson's attorney.  I have carefully discussed every part
18 of this agreement with the authorized representatives of Matson.
19 Further, I have fully advised the authorized representatives of
20 Matson's rights, of possible defenses, of the Sentencing Guidelines'
21 provisions, and of the consequences of entering into this agreement.
   To my knowledge, the decision of Matson and its authorized
23 representatives to enter into this agreement is an informed and
24 voluntary one.
25

26

27 _____        _____
   ROBERT BONNER                      Date
   THOMAS HOLLIDAY
28 Counsel for Defendant
   Matson Navigation Company, Inc.

# ATTACHMENT A

## SUMMARY OF
## MATSON NAVIGATION COMPANY, INC.
### ENVIRONMENTAL COMPLIANCE PROGRAM

A.  Environmental Policy

- Matson's stated environmental policy is "to meet or surpass the requirements of applicable federal, state and local environmental laws and regulations and to conduct its business in an environmentally responsible manner."
- The Chief Executive Officer of Matson is responsible for ensuring that all Company facilities are in compliance with environmental laws and regulations.

B.  Safety, Quality and Environmental Affairs Department

- The Director of Safety, Quality and Environmental Affairs (the "Director") reports to the Chief Executive Officer and is responsible for organizing, planning, developing and directing the environmental affairs programs for the Company and for informing the Chief Executive Officer and senior Matson officers of environmental compliance issues.
- The Director has been appointed as the Designated Person for Matson's Safety Management System, in compliance with the International Safety Management ("ISM") Code, to whom any crew member can report safety and environmental concerns without fear of repercussions.
- The Director's name and telephone number are posted on every ship in Matson's fleet.
- The Director is responsible for investigating and responding to every Non-Conformity Report which he receives.
- The Department has four full time employees and employs outside contractors to work on specific projects.

C.  Vessel Operations and Offshore Labor Relations Department

- All vessel operations-related responsibilities (marine operations, vessel engineering, offshore labor relations) are grouped into one operating unit: Vessel Operations and Offshore Labor Relations.
- The Manager of this Department has an extensive background in vessel operations, including over 20 years of seagoing experience. This level of experience will be maintained.
- In all evaluations that the Manager undertakes for the performance of employees on the vessels that Matson operates, he makes compliance with Matson's environmental policies and the laws of the United States a positive factor and failure to comply as a negative factor.
- The Manager reports directly to the Senior Vice President and General Manager of the Operations Division who reports to the President.
- The Manager submits quarterly reports to the Corporate Compliance Committee.

D.    ISM Code

- Matson has adopted the International Safety Management ("ISM") Code throughout its fleet of vessels.
- All of Matson's active vessels received ISM certification between May of 1998 and August of 1999.
- The ten volume Matson Safety Management System, mandated by the ISM Code, (the "ISM System") sets forth the procedures for all aspects of the vessels' operations, including the generation, handling, storage, treatment and disposal of waste oil, bilge waste and hazardous materials.
  - The Safety and Pollution Manual, which is Volume C of the ISM System, describes the procedures for the proper handling of ballast water, bilge water, petroleum transfer, waste, sewage, soot and hazardous material.
  - Section 4.5 of Procedure C-02-010 instructs the Master of each vessel to ensure that officers and crew members involved in ballast or bunker operations, bilge, garbage and sewage disposal are familiar with relevant procedures and legislation governing these operations and receive proper training.
  - Section 4.6.2 of this Procedure C-02-010 makes the Master responsible for maintaining the Oil Record Book.
  - Procedure C-01-025 in Volume C of the ISM System requires Masters to ensure that all licensed officers aboard Matson vessels view, at least every six months, a videotape entitled "MARPOL - Oil Pollution Regulations and the Oil Record Book." Each Master must keep a record of this training and submit it on a monthly basis to Matson's Marine Personnel Department.
  - Section 4.2.1 of Procedure C-03-030 requires all Matson vessels to conduct oil pollution drills, in accordance with the Shipboard Oil Pollution Emergency Plan ("SOPEP"), at least every five weeks.
  - The Engine Manual, which is Volume G of the ISM System, makes the Chief Engineer responsible for overseeing the implementation and operation of MARPOL regulations in the engine department (Section 4.10).
  - Section 4.4 of Procedure G-03-010 requires a relieving Chief Engineer, upon joining a vessel, to conduct, in the company of the outgoing Chief Engineer, a thorough inspection of the vessel and have a handover conference with the outgoing Chief Engineer. The inspection and conference specifically must include an inspection of the oil water separator and associated piping, valves and controls. After the inspection and conference, the relieving Chief Engineer is required by Section 4.4.3 to sign a form, stating that he or she has properly relieved the outgoing Chief Engineer, and return the form to the Manager of Fleet Maintenance.
  - Procedure G-03-010 charges the Chief Engineer with ensuring that bilge water or contaminated ballast water passes through the oil water separator whenever it is discharged overboard, that the water is discharged when the

vessel is more than 12 miles from land and that the water discharged does not exceed 15 ppm oil at any time.

- The Master's Administrative Manual, Volume I of the ISM System, requires the Master and Chief Engineer to complete annual evaluations of the performances of the Chief Officer (First Mate) and the Chief Assistant Engineer, respectively (Procedure I-02-060).
- The naval architect firm that designed the bilge water processing systems on Matson's vessels prepared detailed instructions, tailored to each individual vessel, as to the proper use of the systems. Copies of these instructions are kept on the vessels.

- Every active vessel in Matson's fleet has a copy of all ten volumes of the ISM System.

- The Director has conducted extensive training on the ISM System for all ships' officers.
  - Section 4.2.1 of Procedure C-03-030 requires all Matson vessels to conduct oil pollution drills, in accordance with the Shipboard Oil Pollution Emergency Plan ("SOPEP"), at least every five weeks.

- In order to maintain its ISM Safety Management Certificates and Document of Compliance, Matson must submit to annual internal and external ISM audits. As part of this program:
  - Matson hires an independent environmental and safety consultant, who is a trained and certified ISM lead auditor, to conduct annual audits of Matson's office for ISM compliance and its vessels' compliance with the ISM System.
  - The Coast Guard has authorized the American Bureau of Shipping ("ABS"), a leading international ship classification society, on its behalf, to conduct ISM audits. Pursuant to this mandate, ABS performs an annual audit of Matson's office for ISM compliance and, at least every 2 ½ years, conducts an ISM audit of every Matson vessel.
  - Under SQE, which Matson is currently in the process of implementing, ABS will perform vessel audits every six months.

- Matson also measures the performance of its vessels in the arenas of safety and environmental protection by the use of the ISM System's Non-Conformity Reporting System. Any person who discovers a non-conformity is required to report the non-conformity to his or her immediate supervisor. The supervisor, in turn, notifies the Master of the vessel who notifies Matson's ISM Designated Person, its Director of Safety, Quality and Environmental Affairs.

- Under the Alternative Compliance Program ("ACP") established by the U.S. Coast Guard, ABS is authorized to act as the Coast Guard's agent in conducting annual inspections in connection with the issuance of the Coast Guard's Certificates of Inspection and the issuance of International Oil Pollution Prevention Certificates, in accordance with MARPOL. The Coast Guard approved Matson's participation in the ACP, and ABS now performs annual inspections of its vessels.

E.  Corporate Compliance Program

- Matson's Code of Conduct affirms Matson's longstanding policy of conducting business in accordance with the highest moral, legal and ethical principles and in compliance with all applicable laws and regulations.
- Every non-bargaining unit employee at Matson received a copy of this Code and was required to attend a seminar, explaining it.
- Each year, at the time of their annual reviews, all Matson non-bargaining unit employees are required to sign an acknowledgment that they have received a copy of the Code and have read and understood it.
- The Code makes it clear that Matson believes that it is every employee's duty to report any violations of the Code to management.
- The Personnel Relations; Safety, Quality and Environmental Affairs; Risk Management; Vessel Operations and Offshore Labor Relations and Law Departments at Matson are required to make quarterly reports to the Corporate Compliance Committee in order to bring any violations of the Code to the Committee's attention.
- The Committee meets quarterly.
- The Committee reports to the Audit Committee of the Board of Directors at least twice a year. The Audit Committee consists of four outside directors.
- The Audit Committee reports at least twice a year to the full Board of Directors.

F.  ISO 9002 Quality Management System

- Matson has implemented the ISO 9002 Quality Management System.
- ISO 9000 is a series of quality management system standards designed by the International Organization for Standardization (a worldwide federation of national standards bodies) to offer independent assurance that a company is capable of consistently delivering service to the specifications required by a customer.

G.  Safety, Quality and Environmental Management Endorsement

- In late 1999, ABS developed a program to certify transportation companies under a new program entitled Safety, Quality and Environmental Management ("SQE").
- The SQE endorsement from ABS combines the ISM certification, ISO 9002 and the new ISO 14001 Environmental Management Standard into one program.
- In July of 2000, Matson began the process of obtaining the SQE endorsement.
- As part of the certification process, Matson will be subject to stringent audits every six months by ABS.